UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No.

| | |
|---|---|
| ANDREA YOUNG<br>3023 Woodland Hill Dr., Apt. 7<br>Ann Arbor, MI 48108 | )<br>)<br>)<br>) |
| MARIA YAKOVCHIK<br>1921 Sixth Ave<br>Norway, MI 49870 | )<br>)<br>)<br>) |
| JAMIE ARDEN<br>Homeless | )<br>)<br>) |
| KATINA PETROPOULOS<br>1800 Mershon Dr.<br>Ann Arbor, MI 48103 | )<br>)<br>)<br>) |
|        Plaintiffs, | )<br>) |
|     v. | )<br>) |
| ALEX M. AZAR<br>SECRETARY, UNITED STATES<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES<br>in his official capacity<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| SEEMA VERMA<br>ADMINISTRATOR, CENTERS FOR<br>MEDICARE AND MEDICAID SERVICES<br>in her official capacity<br>7500 Security Boulevard<br>Baltimore, MD 21244 | )<br>)<br>)<br>)<br>)<br>) |
| UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>) |

1

CENTERS FOR MEDICARE AND       )
MEDICAID SERVICES              )
7500 Security Boulevard        )
Baltimore, MD 21244            )
                               )
       Defendants.

---

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### PRELIMINARY STATEMENT

1.     This case challenges the ongoing efforts of the Executive Branch to bypass the legislative process and act unilaterally to fundamentally transform Medicaid, a cornerstone of the social safety net. Purporting to invoke a narrow statutory waiver authority that allows experimental projects "likely to assist in promoting the objectives" of the Medicaid Act, the Executive Branch has instead effectively rewritten the statute, ignoring congressional restrictions, overturning a half-century of administrative practice, and threatening irreparable harm to the health and welfare of the poorest and most vulnerable in our country.

2.     The Medicaid Act establishes a health insurance program that covers more than 65 million people in the United States. Medicaid enables states to provide a range of federally specified preventive, acute, and long-term health care services and supports to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. As described below, the core populations covered by Medicaid include children; pregnant women; the aged, blind, or disabled; and, as added by the Affordable Care Act ("ACA"), adults with household incomes less than 133% of the federal poverty level ("FPL") (currently $22,490 for a family of two).

3.     The Medicaid program offers a deal for states. If a state chooses to participate, the federal government will contribute the lion's share of the cost of providing care. In return, the state

agrees to pay the remaining portion of the costs of care and to follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. States may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and states must cover all individuals who come within a covered population group.

4.      Section 1115 of the Social Security Act does permit the Secretary of Health and Human Services ("Secretary") to waive certain federal Medicaid requirements, but only in narrow circumstances – when necessary to allow a state to carry out a time-limited, experimental project that is likely to promote the objectives of the Medicaid Act.

5.      On January 11, 2018, the Centers for Medicare & Medicaid Services ("CMS") announced a new approach to Medicaid waivers. Reversing decades of agency guidance, and consistent with the administration's expressed view of the need to "fundamentally transform Medicaid," CMS issued a letter to State Medicaid Directors announcing its intention to, for the first time, approve waiver applications containing work requirements and outlining "guidelines" for states when submitting such applications.

6.      The State of Michigan implemented the ACA Medicaid expansion in 2014. In June 2018, the Michigan Legislature passed a law directing the State to request permission under Section 1115 to condition Medicaid eligibility for the expansion population on mandatory work requirements and, for a subset of the expansion, on heightened and mandatory premiums. The State submitted the corresponding Section 1115 waiver application on September 10, 2018 as an amendment to a pending application to extend the Healthy Michigan Plan waiver ("HMP amended extension application"). The Secretary approved the amended extension application on December 21, 2018, with Special Terms and Conditions.

7.     On February 8, 2019, as required by the state law, Michigan Governor Gretchen Whitmer accepted the Special Terms and Conditions, noting that between 61,000 and 183,000 individuals will lose health coverage as a result of the work requirements.

8.     Michigan will begin implementing the work requirements on January 1, 2020. The State will begin suspending the coverage of individuals who have not met the work requirements on May 1, 2020.

9.     The Secretary's approval will harm Plaintiffs and other individuals throughout the State—teachers, social workers, students, and caregivers—who need a range of health services, including treatment for heart conditions, asthma, high blood pressure, sleep apnea, cancer, arthritis, migraines, and mental health services. Without access to Medicaid coverage, people across Michigan will be forced to forgo treatment for their conditions or will incur significant medical debt when their conditions become so severe that they have no choice but to seek treatment in acute care and emergency department settings.

10.     The Secretary's issuance of the letter to State Medicaid Directors and approval of the HMP amended extension application are unauthorized attempts to re-write the Medicaid Act, and the use of the Social Security Act's waiver authority to "transform" Medicaid is an abuse of that authority. Defendants' approval thus violates both the Administrative Procedure Act and the Constitution and should be vacated.

## JURISDICTION AND VENUE

11.     This is a class action for declaratory and injunctive relief for violation of the Administrative Procedure Act, the Social Security Act, and the United States Constitution.

12.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 to 705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

14.     Plaintiff Andrea Young is 54 years old and lives in Ann Arbor, Michigan. Ms. Young is enrolled in the Healthy Michigan Plan.

15.     Plaintiff Maria Yakovchik is 53 years old and lives in Norway, Michigan. Ms. Yakovchik is enrolled in the Healthy Michigan Plan.

16.     Plaintiff Jamie Arden is 42 years old and, until recently, lived in Flushing, Michigan. She is currently homeless. Ms. Arden is enrolled in the Healthy Michigan Plan.

17.     Plaintiff Katina Petropoulos is 39 years old and lives with her aunt in Ann Arbor, Michigan. Ms. Petropoulos is enrolled in the Healthy Michigan Plan.

18.     Defendant Alex M. Azar is Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. Defendant Azar has overall responsibility for implementation of the Medicaid program, including responsibility for federal review and approval of state requests for waivers pursuant to Section 1115.

19.     Defendant Seema Verma is Administrator of the Centers for Medicare & Medicaid Services ("CMS") and is sued in her official capacity. Defendant Verma is responsible for implementing the Medicaid program as required by federal law, including as amended by the ACA.  Defendant Verma approved the HMP amended extension application.

20.     Defendant HHS is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

21.     Defendant CMS is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act as required by federal law.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this suit individually and on behalf of a statewide class of persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). The class consists of all residents of Michigan enrolled in the Healthy Michigan Plan on or after January 1, 2019.

23.     The prerequisites of Federal Rule of Civil Procedure 23(a) are met in that:

a.     The class is so numerous that joining all members is impracticable. According to the State's enrollment data, as of November 18, 2019, more than 656,000 individuals are enrolled in Healthy Michigan Plan waiver ("HMP waiver"). *See* Michigan Dep't of Health & Human Servs., *Healthy Michigan Plan*, MICHIGAN.GOV, https://www.michigan.gov/mdhhs/0,5885,7-339-71547_2943_66797---,00.html (under heading "Healthy Michigan Plan Enrollment Statistics") (last visited Nov. 22, 2019). The State has projected that between 61,000 and 183,000 individuals will lose health coverage as a result of the work requirements contained in approved Section 1115 waiver project. *See* Ltr. from Gov. Gretchen Whitmer to Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (Feb. 8, 2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/Healthy-Michigan/mi-healthy-michigan-state-acceptance-ltr-20190608.pdf (citing Manatt Health, *Potential Enrollment Impacts of Michigan's Medicaid Work Requirement* (Feb. 2019), https://www.manatt.com/Insights/White-Papers/2019/Potential-Enrollment-Impacts-of-Michigans-Medicaid). The class

members are geographically dispersed throughout the State, have limited financial resources, and are unlikely to institute individual actions;

b. There are questions of fact and law, particularly as to the legality of the Defendants' policies and decisions with respect to issuance of the letter to State Medicaid Directors and approval of the HMP amended extension application, that are common to all members of the class;

c. The claims of the named plaintiffs are typical of the claims of the class; and

d. The named plaintiffs and their counsel will fairly and adequately protect the interests of the class. Each plaintiff is an adult resident of Michigan who is enrolled in the Healthy Michigan Plan and will be subject to the requirements of the HMP waiver.

24. The requirements of Federal Rule of Civil Procedure 23(b)(2) are met in that the Defendants have acted or refused to act on grounds that apply generally to the class, making final declaratory and injunctive relief appropriate with respect to the class as a whole.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Medicaid Program

25. Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-5. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [ ] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id*. § 1396-1.

26.     The statute defines "medical assistance" to include a range of care and services that participating states must cover or are permitted to cover. *Id*. § 1396d(a).

27.     Although states do not have to participate in Medicaid, all states do.

28.     Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id*. § 1396a.

29.     The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements of the Medicaid Act and its associated regulations.

30.     States and the federal government share responsibility for funding Medicaid. Section 1396b requires the Secretary to pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id*. §§ 1396b(a)(1), 1396d(b). The federal reimbursement rate is based on the state's per capita income.

**B.      Medicaid Eligibility and Coverage Requirements**

31.     Using household income and other specific criteria, the Medicaid Act sets forth who is eligible to receive Medicaid coverage. *Id*. §§ 1396a(a)(10)(A), (C). The Act identifies required coverage groups as well as options for extending Medicaid to additional groups. *Id*.

32.     To be eligible for federal Medicaid funding, states must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id*. §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

33.     Before the Affordable Care Act, the mandatory Medicaid population groups included children; parents and other caretaker relatives; pregnant women; and the elderly, blind, and disabled. 42 U.S.C. § 1396a(a)(10)(A)(i).

34. In 2010, Congress passed, and the President signed, comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010), *as amended by* the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029. "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

35. As part of the ACA, Congress amended the Medicaid Act to add a mandatory population group. Effective January 1, 2014, the Medicaid Act requires states to cover adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household income below 133% of the FPL. 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14). This group, often called the "expansion population," includes adults in a variety of family circumstances: parents living with children (whose incomes exceed the state-established limit for the mandatory parent/caretaker population group); parents of older children who have left the home; and adults without children.

36. States receive enhanced federal reimbursement for medical assistance provided to the Medicaid expansion population: 93% federal reimbursement in 2019, and 90% in 2020 and each year thereafter. *Id.* § 1396d(y).

37. In *National Federation of Independent Business v. Sebelius*, the U.S. Supreme Court held that HHS could not terminate all Medicaid funding to states if they fail to extend Medicaid coverage to the expansion population. 567 U.S. 519 (2012).

38. States that cover the expansion population submit state plan amendments electing to provide this coverage. To date, 34 states (including D.C.) have implemented the Medicaid expansion.

39.     Michigan has an approved state Medicaid plan that covers the expansion population. *See* State Plan Amendment MI-14-0170, https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/MI/MI-14-0170.pdf.

40.     Once a state elects to expand coverage to the expansion population, it becomes a mandatory coverage group.

41.     As noted above, the Medicaid Act allows states to extend Medicaid eligibility to certain optional population groups, including children and pregnant women with incomes between 133% and 185% of FPL, *see* 42 U.S.C. § 1396a(a)(10)(A)(ii)(IX), limited-income aged, blind, and/or disabled individuals receiving home and community-based services, *id.* § 1396a(a)(10)(A)(ii)(VI), and "medically needy" individuals who would fall within a mandatory population but for excess income or resources. *Id.* § 1396a(a)(10)(C).

42.     The Medicaid Act requires a participating state to cover *all* members of a covered population group. The state may not cover subsets of a population group described in the Medicaid Act. *See id.* § 1396a(a)(10)(B). This requirement applies to optional and mandatory population groups. *Id.*

43.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act. *See id.* § 1396a(a)(10)(A).

44.     In addition to addressing *who* is eligible for medical assistance, the Medicaid Act delineates how states must make and implement eligibility determinations to ensure that all eligible people who apply are served and get coverage.

45.     States must determine eligibility and provide medical assistance to all eligible individuals with "reasonable promptness." *Id.* § 1396a(a)(8); 42 C.F.R. § 435.912(c)(3) (requiring states to determine eligibility within 90 days for individuals who apply on the basis of disability

10

and 45 days for all other individuals). An individual may apply for and enroll in Medicaid at any time. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.906.

46.     The Medicaid Act sets forth mandatory services that participating states must include in their Medicaid programs and optional services that states may include. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).

47.     The Medicaid Act establishes the states' options for imposing premiums and cost sharing on enrollees. To ensure affordability, the Act permits states to impose premiums and cost sharing only in limited circumstances.

48.     Congress amended the Medicaid Act in 1982 to remove the substantive premium and cost sharing provisions from 42 U.S.C. § 1396a, amend them, and place them in a new provision, Section 1396*o*. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 367.

49.     As a result of that amendment, Section 1396a, which generally lists the requirements that a state plan must satisfy, provides that "enrollment fees, premiums, or similar charges, and deductions, cost sharing, or similar charges" may be imposed "only as provided in section 1396*o*." 42 U.S.C. § 1396a(a)(14).

50.     With respect to premiums, Section 1396*o* of the Medicaid Act provides that "no enrollment fee, premium, or similar charge will be imposed under the plan (except for a premium imposed under subsection (c))." *Id*. § 1396*o*(a)(1). Subsection (c), in turn, authorizes limited premiums, but generally prohibits a state from imposing any premiums on individuals whose income falls below 150% of the federal poverty line. *Id*. § 1396*o*(c)(1).

51.     Section 1396*o*-1, which Congress passed in 2006 to give states additional flexibility to impose premiums and cost sharing on enrollees, likewise prohibits a state from imposing any

premiums on individuals with household income below 150% of FPL. Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4, 82 (codified at 42 U.S.C. § 1396o-1(b)(1)(A)).

52.     Nothing in Section 1396*o* or 1396*o*-1 gives the Secretary authority to waive these limits on premiums.

53.     The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility … and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

### C.     The Secretary's Section 1115 Waiver Authority

54.     Section 1115 of the Social Security Act, codified at 42 U.S.C. § 1315, grants the Secretary authority to waive a state's compliance with certain requirements of the Medicaid Act under certain conditions.

55.     The Secretary may grant a Section 1115 Medicaid waiver only in the case of an "experimental, pilot, or demonstration project which . . . is likely to assist in promoting the objectives" of the Medicaid Act. *Id*. § 1315(a).

56.     The Secretary may only waive requirements of Section 1396a of the Medicaid Act. *Id*. § 1315(a)(1).

57.     The Secretary may not waive compliance with requirements that Congress has placed outside of Section 1396a.

58.     The Secretary may grant a Section 1115 waiver "only to the extent and for the period necessary" to enable the state to carry out the experimental, pilot, or demonstration project. *Id*.

59.     The costs of such a project, upon approval, are included as expenditures under the state Medicaid plan. *Id*. § 1315(a)(2).

60.     The Secretary must follow certain procedural requirements before approving a Section 1115 project. *Id.* § 1315(d); 42 C.F.R. §§ 431.400 to 431.416. In particular, after receiving a complete application from a state (following a state-level public comment period), the Secretary must provide a 30-day public notice and comment period. *See* 42 U.S.C. § 1315(d); 42 C.F.R. § 431.416.

61.     The Secretary does not have the authority to waive compliance with the United States Constitution or other federal laws.

62.     For example, the Fair Labor Standards Act ("FLSA") requires that all individuals, including individuals receiving public benefits, be compensated at least the minimum wage in exchange for hours worked. *See* 29 U.S.C. § 206(a)(1)(C); Dep't of Labor, *How Workplace Laws Apply to Welfare Recipients* at 2 (1997), http://nclej.org/wp-content/uploads/2015/11/LaborProtectionsAndWelfareReform.pdf. Notably, the Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF") statutes specifically refer to work requirements and describe how the benefits interact with the FLSA minimum wage protections. *See* 7 U.S.C. § 2029(a)(1) (SNAP); 42 U.S.C. § 607 (TANF). In contrast, there is no such reference or description in the Medicaid Act. And according to the Department of Labor, medical assistance, unlike SNAP and TANF cash benefits, may not be substituted for a wage. *See How Workplace Laws Apply to Welfare Recipients* at 4.

### D.     Medicaid in Michigan and the Healthy Michigan Plan

63.     Michigan, like all other states, has elected to participate in Medicaid. *See* Mich. Comp. Laws §§ 400.105-400.112k; Mich. Admin. Code § 400.3401-.3425, 400.7171-.7173. The Michigan Department of Health and Human Services ("DHHS") administers the program at the state level.

64.     The federal government generally reimburses Michigan for approximately 64% of the cost of providing medical assistance through its Medicaid program. *See* 83 Fed. Reg. 61157-60 (Nov. 28, 2018) (fiscal year 2020).

65.     Before the Affordable Care Act, Michigan operated a project called the "Adult Benefits Waiver," which provided coverage to childless adults with incomes below 35% FPL who were not otherwise eligible for Medicaid.

66.     In 2013, Michigan passed legislation to expand Medicaid coverage to the Medicaid expansion group. Mich. Pub. L. No. 107 § 106(c)   (2013) (codified at Mich. Comp. Laws § 400.106(c)).

67.     Effective April 1, 2014, Michigan amended its state plan to cover the Medicaid expansion population. *See* State Plan Amendment MI-14-0170, https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/MI/MI-14-0170.pdf.

68.     Large numbers of individuals in the expansion population have used their Medicaid coverage, receiving critical care and treatment. Nearly half of individuals enrolled in the Medicaid expansion reported better physical health, and nearly 40% reported better mental and dental health since enrolling. *See* Renuka Tipirneni et al., *Changes in Health and Ability to Work Among Medicaid Expansion Enrollees: a Mixed Methods Study*, 34 J. Gen. Internal Med. 272 (Feb. 2019), https://link.springer.com/article/10.1007/s11606-018-4736-8.  Nearly one-third of individuals enrolled in the expansion discovered they had an undiagnosed chronic illness. *See* Ann-Marie Rosland, *Diagnosis and Care of Chronic Health Conditions Among Medicaid Expansion Enrollees: a Mixed-Methods Observational Study*, 34 J. Gen. Internal Med. 2549 (Nov. 2019), https://link.springer.com/article/10.1007/s11606-019-05323-w.

69.     Michigan's Medicaid expansion has also had positive effects for individuals' financial well-being. One study found a 27% reduction in unpaid debt, a 52% reduction in medical bills sent to collections, and an 11% decrease in bankruptcies. *See* Sarah Miller et al., Nat'l Bureau of Econ. Research, *Working Paper 25053: The ACA Medicaid Expansion in Michigan and Financial Health*, 4 (2019), https://www.nber.org/papers/w25053.pdf.

70.     The 2013 state law authorizing the Medicaid expansion also directed the State to request authority under Section 1115 to require the expansion population to pay premiums and copayments that could be reduced, but not eliminated, if individuals engaged in certain "healthy behaviors" identified by the State. Mich. Pub. L. No. 107 § 105d(1) (2013).

71.     To implement that legislation, Michigan submitted an application to amend the existing Adults Benefits Waiver to include the entire Medicaid expansion population, to charge individuals copayments and premiums, and to rename the project the "Healthy Michigan Plan" or "HMP." State of Michigan, *Healthy Michigan Plan: A Waiver Amendment Request Submitted Under Authority of Section 1115 of the Social Security Act* (Nov. 8, 2013), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/Healthy-Michigan/mi-healthy-michigan-waiver-amend-req-11082013.pdf

72.     The application was approved on December 30, 2013, effective through December 31, 2018. *See* Ltr. from Marilyn Tavenner, Ctrs. for Medicare & Medicaid Servs. to Stephen Fitton, Dir. Mich. Medical Servs. Admin (Dec. 30, 2013); CMS Special Terms and Conditions ("2013 STCs"), collectively available at https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/Healthy-Michigan/mi-healthy-michigan-cms-amend-appvl-12302013.pdf.

73.     The approval permitted Michigan to charge all HMP enrollees copayments, called "average copayment amounts." The average copayment amount is calculated by tracking the copayments an individual incurred during the prior six months of enrollment and calculating an average monthly amount. The Secretary directed that these average copayments be billed to the enrollee at the end of each quarter. *See* 2013 STCs ¶¶ 28, 29.

74.     In addition to the average copayments, the Secretary permitted Michigan to charge enrollees with incomes between 100% and 133% FPL a monthly premium equal to two percent of the individual's annual income. *Id.* ¶ 28.

75.     Enrollees pay both their average copayment amounts and monthly premiums into a "MI Health Account" account. *Id.* The copayments and premium amounts can be reduced by up to half if the individual completes a health risk assessment ("HRA") or other "healthy behavior" identified by the State, such as receiving a vaccine or completing a cancer screening. *Id.* ¶¶ 28, 32.

76.     At the time, the Secretary specified that "[n]o individual may lose eligibility for Medicaid or be denied eligibility for Medicaid, be denied enrollment in a Healthy Michigan health plan, or be denied access to services for failure to pay premiums or copayment liabilities." *Id.* ¶ 29(a).

**E.     Extension and Amendment of the Healthy Michigan Plan**

77.     In December 2017, the State submitted an application to extend the HMP waiver, which was set to expire on December 31, 2018. *See* Mich. Dep't of Health & Human Servs., *Section 1115 Demonstration Extension Application, Healthy Michigan Plan* (Dec. 6, 2017), [https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/mi-healthy-michigan-pa2.pdf](https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/mi-healthy-michigan-pa2.pdf) ("HMP Extension Application").

78.     The HMP Extension Application did "not seek[] any additional program changes."
*Id.* at 4.

79.     In a cover letter attached to the HMP Extension Application, then Governor Rick Snyder noted that approximately 650,000 people had enrolled in the Medicaid expansion, and expansion coverage had reduced uncompensated care costs for hospitals by almost 50%, from $7.21 million to $3.77 million. *See* Letter from Governor Rick Snyder to Eric D. Hargan, Acting Secretary, U.S. Dep't of Health & Human Servs. (Dec. 6, 2017), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/mi-healthy-michigan-pa2.pdf.

80.     In June 2018, the Michigan Legislature passed a law directing the State to seek an amendment to its Section 1115 project that would add work requirements for the Medicaid expansion population. That law also required the State to seek two additional eligibility requirements for enrollees with incomes above 100% FPL who had maintained coverage under the HMP for 48 cumulative months: (1) required healthy behaviors and (2) increased premiums. S.B. 897, 99th Leg. Reg. Sess. (Mich. 2018), http://www.legislature.mi.gov/(S(kesuvjxu51w1gk2d2aeswx5m))/mileg.aspx?page=GetObject&objectname=2018-SB-0897.

81.     Michigan submitted the amended HMP extension application on September 10, 2018. *See* Letter from Governor Rick Snyder to Alex Azar, Sec'y, Dep't of Health & Human Servs. (Sept. 10, 2018), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/mi-healthy-michigan-pa3.pdf ("HMP Amended Extension Application").

82. Governor Snyder explained that the HMP Amended Extension Application "is designed to promote accountability, self-sufficiency, and independence from public assistance." *Id.* at 1.

83. The HMP Amended Extension Application further stated, "Michigan seeks to promote work and community engagement and provide incentives to beneficiaries to increase their sense of purpose, build a healthy lifestyle, and further the positive physical and mental health benefits associated with work. MDHHS workforce engagement requirements are designed to assist, encourage, and prepare an able-bodied adult for a life of self-sufficiency and independence from governmental interference." HMP Amended Extension Application at 5.

84. During the State comment period for the amended extension application, Michigan's application explained that "MDHHS expects the annual HMP enrollment to decrease but the total number of beneficiaries who will be impacted is unknown at this time." *See* Mich. Dep't of Health & Human Servs., *Section 1115 Demonstration Extension Application - Healthy Michigan Plan, Amended: July 9, 2018*, at 14 attached as Exhibit A.

85. In its HMP Amended Extension Application, the State estimated that approximately 400,000 of the 655,000 enrollees would be subject to the new eligibility conditions but did not estimate the number of individuals who might lose coverage as a result of the proposed amendments. HMP Amended Extension Application at 16.

86. The federal public comment period on the HMP Amended Extension Application ran from September 26, 2018 through October 26, 2018. *See* Medicaid.gov, Healthy Michigan - Amendment Request, https://public.medicaid.gov/connect.ti/public.comments/view Questionnaire?qid=1898787 (last visited Nov. 22, 2019).

87.     On December 21, 2018, the Secretary approved the HMP Amended Extension Application, effective January 1, 2019 through December 31, 2023. *See* Ltr. from Seema Verma, Admr., Ctrs for Medicare & Medicaid Servs., to Kathy Stiffler, Acting Dir., Mich. Dep't of Health & Human Servs. (Dec. 21, 2018) ("HMP Approval Letter"); CMS, HMP Waiver List ("Waiver List"); CMS, HMP Special Terms and Conditions ("2018 STCs"), collectively available at https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/ 1115/downloads/mi/mi-healthy-michigan-ca.pdf.

88.     In the cover letter of the approval, Defendant Verma stated that CMS is dedicated to reforms that "improve health and help lift individuals out of poverty." Letter from Seema Verma, Adm'r., Ctrs. for Medicare & Medicaid Servs., to Governor Rick Snyder (Dec. 21, 2018) https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/ 1115/downloads/mi/mi-healthy-michigan-ca.pdf.

89.     The approval letter described the project as having two objectives: to "promote[] beneficiary health and financial independence" and to "furnish medical assistance in a manner that improves the sustainability of the safety net." HMP Approval Letter at 5, 8; *see also id*. at 3 (listing the factors examined in considering the project).

90.     The Secretary did not provide an estimate of how many people would lose Medicaid with the HMP Amended Extension Application in place, stating that "[i]t is not possible to predict the percentage of this group of beneficiaries who will not comply with the demonstration amendments affecting eligibility." HMP Approval Letter at 13.

91.     The Secretary's approval extended the average copayment amounts and premium components, *see* ¶¶ 73-74, *supra*., that were set to expire on December 31, 2018. *See* 2018 STCs ¶¶ 22-24; ¶ 22(c) (now referring to premiums as "monthly contributions").

92.     As in the original waiver, individuals subject to the average copayments and individuals subjected to the premiums may not lose eligibility or be denied services for failure to pay. *Id.* ¶ 22(d). The Secretary granted Michigan authority to attempt to collect unpaid premiums. *Id.* ¶ 26.

93.     The HMP Amended Extension Approval added three new conditions on coverage:

Work and Community Engagement Requirements

94.     Under the Secretary's approval, HMP enrollees aged 19 to 62 must engage in specified work or work-related activities for 80 hours per month. 2018 STCs ¶¶ 28, 30.

95.     The work requirements do not apply to pregnant women, medically frail individuals, or individuals with a disability or other condition that prevents them from working, as verified by a licensed medical professional. *Id.* ¶ 29.

96.     In addition, enrollees who meet certain other criteria are exempt from the requirements, such as being a full-time student, serving as the primary caregiver for a child under age six, caring for an individual with a disability, having been incarcerated within the last six months, or current receipt of unemployment benefits. *Id.* Individuals who comply with or are exempt from SNAP or TANF work requirements are deemed compliant with or exempt from the work requirements. *Id.*

97.     Enrollees who are not exempt must report their work activities monthly. *Id*. ¶ 31.

98.     Enrollees who do not report the required hours for three months in a 12-month period will lose coverage at the end of the fourth month, unless during the fourth month, the individual completes 80 hours of qualifying activities or demonstrates that they qualify for a good cause or other exemption. *Id.* ¶ 32. There is one good cause exemption: individuals who are unable

to meet the requirement for reasons related to their own or an immediate family member's disability or serious illness. *Id.* ¶ 32(c).

99.     An individual who is dis-enrolled at the end of the fourth month is not permitted to re-enroll for one month. Thereafter, an individual can re-enroll by completing 80 hours of qualifying activities in one month. *Id.*

100.     In approving the work requirements, the Secretary stated that the project will help the Secretary "evaluate whether the community engagement requirement helps adults in HMP transition from Medicaid to financial independence, thus reducing dependency on public assistance" and that the work requirements are "intended to encourage beneficiaries to attain greater levels of financial independence." HMP Approval Letter at 7.

101.     The Secretary did not estimate the coverage loss that would result from the work requirements.

102.     The Secretary approved the project without an evaluation design for the experiment in place. On information and belief, that is still missing.

103.     Michigan will begin implementing the work requirements on January 1, 2020. HMP Approval Letter at 4; 2018 STCs ¶ 28; *see also* Healthy Michigan Plan, Changes Coming in January 2020, https://www.michigan.gov/healthymiplan/0,5668,7-326-90904---,00.html (last visited Nov. 22, 2019).

104.     The State has projected that between 61,000 and 183,000 individuals will lose health coverage as a result of the work requirements. *See* Ltr. from Gov. Gretchen Whitmer to Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (Feb. 8, 2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/mi/Healthy-Michigan/mi-healthy-michigan-state-acceptance-ltr-20190608.pdf (citing

Manatt Health, *Potential Enrollment Impacts of Michigan's Medicaid Work Requirement* (Feb. 2019),    https://www.manatt.com/Insights/White-Papers/2019/Potential-Enrollment-Impacts-of-Michigans-Medicaid).

Heightened Premiums and Penalties for Failure to Pay

105.    HMP enrollees with 48 or more months of cumulative enrollment in HMP and incomes above 100% FPL are not subject to the average copayments. Instead, the Secretary has approved the State to charge these individuals premiums of up to five percent of their income. 2018 STCs ¶ 23(a).

106.    Individuals who do not pay the five percent premium will be terminated from coverage 60 days after the "invoice date of the missed premium." *Id.*

107.    Individuals who are disenrolled for failure to pay premiums may not re-enroll until they pay the missed premiums or demonstrate they are exempt from premiums or eligible under another Medicaid eligibility category not subject to the premium requirements. *Id.*

108.    Certain individuals are exempt from the premium requirements: pregnant women, individuals who are medically frail, children under 21 years of age, individuals enrolled in a Flint-specific Section 1115 project, and American Indian/Alaskan Natives. *Id.* ¶ 25.

109.    The Secretary described the purpose of the premiums and associated consequences for inability to pay as "prepar[ing] beneficiaries to participate in the commercial market." HMP Approval Letter at 7.

110.    The HMP Approval Letter cited an "interim" report that assessed a similar Section 1115 premium project that has been in place in Indiana since January 1, 2008. HMP Approval Letter at 6, 17 notes 4 and 11. That interim report found the premiums and associated consequences for failure to pay reduced enrollment in Medicaid in Indiana. *See, e.g.*, Lewin Group, *Indiana HIP*

*2.0: POWER Account Contribution Assessment*, ii, 8-12 (2017), https://www.medicaid.gov/ Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-POWER-acct-cont-assesmnt-03312017.pdf.

111.    Comments submitted during the federal comment period cited numerous previous studies of the effects of premiums on low-income individuals' enrollment. This redundant research consistently concludes that such premiums reduce enrollment in Medicaid.

112.    The HMP Amended Extension Approval granted Michigan permission to implement the premiums starting January 1, 2020. 2018 STCs ¶ 23. On September 23, 2019, the Governor of Michigan announced that the State will defer implementation of the new premium requirements until October 1, 2020. *See* Letter from Governor Gretchen Whitmer to Mich. Senate (Sept. 23, 2019), https://content.govdelivery.com/attachments/MIEOG/2019/09/23/ file_attachments/1290341/190923%20-%20Letter%20from%20Gov.%20Whitmer%2 0to%20MI%20Senate_signed.pdf.

Healthy Behavior Requirements as a Condition of Eligibility

113.     Like all other HMP enrollees, enrollees with 48 or more months of cumulative enrollment in HMP and incomes above 100% FPL must complete either an HRA or a specified healthy behavior, such as receiving a vaccine or cancer screening, as a condition of eligibility. 2018 STCs ¶ 24(c).

114.    In approving the HMP Amended Extension Application, the Secretary granted Michigan permission to impose new restrictions on certain beneficiaries. The State may terminate coverage for beneficiaries with incomes above 100% FPL and 48 cumulative months of enrollment if it cannot confirm completion of the healthy behavior or HRA in the 12 months preceding the individual's annual redetermination. *Id.*

115.    An individual who loses coverage for failure to complete the required healthy behavior must complete an HRA prior to re-enrolling, unless they demonstrate that they are exempt from the healthy behavior requirement or are eligible for another Medicaid eligibility category that is not subject to the requirement. *Id.* If an individual does not answer all of the required questions on the HRA, eligibility will be denied. *Id.*

116.    Individuals in this category also do not receive any reductions in their premium obligations for completion of the healthy behaviors. *Id.*

117.    Certain individuals are exempt from the healthy behavior requirements: pregnant women, individuals who are medically frail, American Indian/Alaska Natives, and individuals enrolled in a Flint-specific § 1115 demonstration waiver. 2018 STCs ¶ 25.

118.    On September 23, 2019, the Governor of Michigan announced that the State will defer implementation of the new healthy behavior requirements until October 1, 2020. *See* Letter from Governor Gretchen Whitmer to Mich. Senate (Sept. 23, 2019), https://content.govdelivery.com/attachments/MIEOG/2019/09/23/file_attachments/1290341/ 190923%20-%20Letter%20from%20Gov.%20Whitmer%20to%20MI%20Senate_signed.pdf.

**F.    Action Taken by the Defendants to Allow Work Requirements**

119.    Prior to 2017, CMS's website stated that the purpose of Section 1115 waivers is to "demonstrate and evaluate policy approaches such as:

- Expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible;

- Providing services not typically covered by Medicaid; or

- Using innovative service delivery systems that improve care, increase efficiency, and reduce costs."

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited September 5, 2017). The "general criteria" CMS used when assessing waiver applications looked at whether the demonstration would:

> 1. Increase and strengthen overall coverage of low-income individuals in the state;

> 2. Increase access to, stabilize, and strengthen providers and provider networks available to serve Medicaid and low-income populations in the state;

> 3. Improve health outcomes for Medicaid and other low-income populations in the state; or

> 4. Increase the efficiency and quality of care for Medicaid and other low-income populations through initiatives to transform service delivery networks.

*Id.* (last visited November 21, 2019).

120.    Prior to 2017, CMS recognized that work requirements do "not support the objectives of the [Medicaid] program" and "could undermine access to care." Letter from Andrew M. Slavitt, Acting Adm'r, Ctrs. for Medicare & Medicaid Servs., HHS to Thomas Betlach, Dir. Airz. Health Care Cost Containment System (Sept. 30, 2016); *see also* Sec'y of Health & Human Servs. Sylvia Burwell, Hearing on The President's Fiscal Year 2017 Budget, Responses to Additional Questions for the Record, U.S. House of Rep. Energy & Commerce Health Subcommittee, 13 (Feb. 24, 2016), http://docs.house.gov/meetings/IF/IF14/20160224/104521/HHRG-114-IF14-Wstate-BurwellS-20160224-SD002.pdf.

121.    The current HHS abruptly reversed course to authorize work requirements in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017, https://wapo.st/2Do6m8v.

122.    On the day he took office, President Trump signed an Executive Order calling on federal agencies to undo the ACA "[t]o the maximum extent permitted by law." Executive Order

13765, Minimizing the Economic Burden of the Patient Protection and Affordable Care Act

Pending Repeal, 82 Fed. Reg. 8351 (Jan. 20, 2017), https://www.federalregister.gov/documents/

2017/01/24/2017-01799/minimizing-the-economic-burden-of-the-patient-protection-and-

affordable-care-act-pending-repeal.

123.     On March 14, 2017, Defendant Seema Verma was sworn in as the Administrator

of CMS. Defendant Verma and former Secretary Price immediately issued a letter to state

governors announcing CMS's disagreement with the ACA's Medicaid expansion, stating that

"[t]he expansion of Medicaid through the Affordable Care Act ('ACA') to non-disabled, working-

age adults without dependent children was a clear departure from the core, historical mission of

the program." Sec'y of Health & Human Servs., Dear Governor Letter 1, https://www.hhs.gov/

sites/default/files/sec-price-admin-verma-ltr.pdf.

124.     Since then, Defendant Verma has made repeated public statements criticizing the

expansion of Medicaid to "able-bodied individual[s]," advocating for lower enrollment in

Medicaid, and outlining plans to "reform" Medicaid through agency action. Casey Ross, *Trump

health official Seema Verma has a plan to slash Medicaid rolls, Here's how*, Stat, Oct. 26, 2017,

https://www.statnews.com/2017/10/26/seema-verma-medicaid-plan/ (last visited Nov. 22, 2019).

125.     On November 7, 2017, at a speech before the National Association of Medicaid

Directors, Defendant Verma declared that the ACA's decision to "move[] millions of working-

age, non-disabled adults into" Medicaid "does not make sense" and announced that CMS would

resist that change by approving state waivers that contain work requirements. Speech: Remarks by

Administrator Seema Verma at the National Association of Medicaid Directors (NAMD) 2017

Fall Conference, CMS.gov (Nov. 7, 2017), https://go.cms.gov/2PELxLW.

126.    On November 10, 2017, Defendant Verma gave an interview in which she declared that one of the "major, fundamental flaws in the Affordable Care Act was putting in able bodied adults," declaring that Medicaid was "not designed for an able bodied person," and announcing that CMS is "trying" to "restructure the Medicaid program." Wall Street Journal, *The Future of: Health Care* (Nov. 10, 2017), https://on.wsj.com/2AMeGMW (last visited Nov. 22, 2019).

127.    In early November 2017, CMS revised its website to invite states to submit Section 1115 waivers that would:

1. Improve access to high-quality, person-centered services that produce positive health outcomes for individuals;

2. Promote efficiencies that ensure Medicaid's sustainability for beneficiaries over the long term;

3. Support coordinated strategies to address certain health determinants that promote upward mobility, greater independence, and improved quality of life among individuals;

4. Strengthen beneficiary engagement in their personal healthcare plan, including incentive structures that promote responsible decision-making;

5. Enhance alignment between Medicaid policies and commercial health insurance products to facilitate smoother beneficiary transition; and

6. Advance innovative delivery system and payment models to strengthen provider network capacity and drive greater value for Medicaid.

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited Nov. 22, 2019).

128.    CMS has explained that "[t]he revised website content signals a new, broader view of these demonstrations in which states can focus on evidence-based approaches that drive better health outcomes, and quality of life improvements, and support upward mobility and self-sufficiency." Ctrs. for Medicare & Medicaid, Press release: *CMS announces new policy guidance for states to test community engagement for able-bodied adults* (Jan. 11, 2018),

https://www.cms.gov/newsroom/press-releases/cms-announces-new-policy-guidance-states-test-community-engagement-able-bodied-adults.

129.    On January 11, 2018, Defendant CMS issued a letter to State Medicaid Directors titled "Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries." Letter from Brian Neale, Dir., Ctr. for Medicaid & CHIP Servs., to State Medicaid Directors        (Jan.        11,        2018),        https://www.medicaid.gov/federal-policy-guidance/downloads/smd18002.pdf ("Dear State Medicaid Director Letter").

130.    The nine-page document "announc[es] a new policy" that allows states to impose "work and community engagement" requirements on certain Medicaid recipients – specifically, "non-elderly, non-pregnant adult Medicaid beneficiaries who are eligible for Medicaid on a basis other than disability." *Id*. at 1.

131.    The Dear State Medicaid Director Letter acknowledges that allowing states to implement work requirements "is a shift from prior agency policy." *Id*. at 3.

132.    The Dear State Medicaid Director Letter was not submitted for notice and comment and was not published in the Federal Register.

133.    The same day CMS issued the Dear State Medicaid Director Letter, it received several letters critical of this novel policy position, including from members of Congress and nonprofit organizations. The National Health Law Program ("NHeLP") explained that the Dear State Medicaid Director Letter "entirely ignore[d] the wealth of literature regarding the negative health consequences of work requirements, which was repeatedly cited by NHeLP and others in those state-specific comments." Letter from Jane Perkins, Legal Dir., Nat'l Health Law Program, to   Brian   Neale,   Dir.,   Ctrs.   for   Medicare   &   Medicaid   Servs.   (Jan.   11,   2018),

https://9kqpw4dcaw91s37kozm5jx17-wpengine.netdna-ssl.com/wp-content/uploads/2018/01/

NHeLP-Letter-Re-Work-DSMD.pdf.

134.    On or about January 18, 2018, CMS further emphasized that it disagrees with the

legislative expansion of Medicaid under the ACA and that it had announced the "new policy

guidance" to support state implementation of work requirements intended to target that expansion

population. CMS, Community Engagement Initiative Frequently Asked Questions,

https://www.medicaid.gov/medicaid/section-1115-demo/community-engagement/index.html

(last visited Nov. 22, 2019).

135.    CMS included terms and conditions when approving the HMP Amended Extension

Application that require Michigan to follow requirements set out in the State Medicaid Letter. *See*,

*e.g.*, 2018 STCs ¶ 29 (exempting from work requirement enrollees with a medical condition that

would prevent compliance); *id.* (exempting individuals identified by the state as medically frail);

*id.* (exempting enrollees who are exempt or complying with from SNAP/TANF work

requirements); *id.* (counting compliance with SNAP/TANF requirements as compliance with

Medicaid work requirements); *id.* ¶ 30 (treating participation in substance use disorder treatment

as a qualifying activity); *id.* ¶ 33 (requiring reasonable modifications for enrollees with ADA-

protected disabilities, including exemption from participation); *id.* ¶ 34(k) (promising that

Michigan will assess areas with limited economies and/or educational activities or higher barriers

to participation to determine whether further exemptions or modifications are needed).

136.    The Secretary has also implemented the policy guidance in the Dear State Medicaid

Director Letter by approving similar work requirements in several other states: Kentucky,

Arkansas, Indiana, Wisconsin, New Hampshire, Maine, Arizona, Ohio, and Utah. *See*, *e.g.*, Seema

Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (@Seema CMS), Twitter (Mar. 5, 2018,

9:45 AM), https://twitter.com/SeemaCMS/status/1076221399390478336 (last visited Nov. 22, 2019) ("Maine marks the 7th community engagement demonstration we have approved since announcing this important opportunity earlier this year.").

137.    The Defendants have continued to express their opposition to the Medicaid expansion and their intent to transform the Medicaid program through work requirements. For example, Defendant Verma stated: "As you know, Obamacare put millions of people, millions of able-bodied individuals, into a program that was built for our most needy, for our most vulnerable citizens. And so, we think that the program needs change. It needs to be more adaptable and more flexible to address the needs of the newly-covered population." Interview by Bertha Coombs, CNBC, with Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs., (May 1, 2018).

138.    In July 2018, after *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) vacated and remanded HHS's approval of the Kentucky HEALTH project, which included work requirements, Defendant Verma reiterated that CMS is "very committed" to work requirements and wants "to push ahead with our policy initiatives and goals." Dan Goldberg, *Verma: Court ruling won't close door on other Medicaid work requests*, Politico, July 17, 2018, https://www.politico.com/story/2018/07/17/trump-medicaid-work-requests-states-verma-726303.

139.    In July 2018, Defendant Azar similarly stated: "We are undeterred. We are proceeding forward. . . . We're fully committed to work requirements and community participation in the Medicaid program. . . . we will continue to litigate, we will continue to approve plans, we will continue to work with states. We are moving forward." Colby Itkowitz, *The Health 202: Trump administration 'undeterred' by court ruling against Medicaid work requirements,* Wash. Post, July 25, 2018,   https://www.washingtonpost.com/news/powerpost/paloma/the-health-

202/2018/07/27/the-health-202-trump-administration-undeterred-by-court-ruling-against-medicaid-work-requirements/5b5a10bb1b326b1e64695577/?utm_term=.7ba76e8a0719.

140.    Defendant Azar commended Defendant Verma, stating that she "is now overseeing the next great generation of transformation in Medicaid, through our efforts to encourage work and other forms of community engagement." Alex M. Azar II, Sec'y, U.S. Dep't of Health & Human Servs., Remarks on State Healthcare Innovation at the American Legislative Exchange Council Annual Meeting (Aug. 8, 2018).

141.    In a speech on September 27, 2018, Defendant Verma explained that the Dear State Medicaid Director Letter "guidance was followed by four approvals of innovative Medicaid demonstrations" and elaborated that "[w]e are committed to this issue and we are moving closer to approving even more state waivers. As such, I'm happy to share with you today that we have finalized the terms for our next innovative community engagement demonstration, which we expect to deliver to the state very soon." SPEECH: Remarks by Administrator Seema Verma at the 2018 Medicaid Managed Care Summit, CMS.gov (Sep. 27, 2018), https://www.cms.gov/newsroom/press-releases/speech-remarks-administrator-seema-verma-2018-medicaid-managed-care-summit.

142.    On December 21, 2018, the Secretary approved the Michigan HMP Amended Extension Application.

143.    That same day, Administrator Verma tweeted, "The Christmas sleigh has made deliveries to Kansas, Rhode Island, Michigan, and Maine to drop off signed #Medicaid waivers. Christmas came early for these Governors. . . ." Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (@Seema CMS), Twitter (Dec. 21, 2018, 1:13 PM), https://twitter.com/seemacms/status/1076224135037108224?lang=en.

144.    On March 11, 2019, President Trump issued his 2020 budget. That budget proposes legislation to impose work requirements nationally and estimates they will save $130 billion over ten years. *See* Dep't of Health & Human Servs., *FY 2020 Budget in Brief*, 100 (Mar. 11, 2019), https://www.hhs.gov/sites/default/files/fy-2020-budget-in-brief.pdf.

145.    On March 14, 2019, CMS issued new guidance, further implementing the policies announced in the Dear State Medicaid Director Letter. The new guidance provides "standard monitoring metrics" that states must use to evaluate projects that require work or community engagement among working age adults. *Press Release: CMS Strengthens Monitoring and Evaluation Expectations for Medicaid 1115 Demonstrations*, CMS.gov (Mar. 14, 2019), https://www.cms.gov/newsroom/press-releases/cms-strengthens-monitoring-and-evaluation-expectations-medicaid-1115-demonstrations.

146.    The guidance repeatedly notes CMS will continue to apply the guidelines set forth in the January 11, 2018 Dear State Medicaid Director Letter and clarifies that the letter communicates "CMS's expectation that states test the effects of community engagement requirements on health, well-being, independence, and the sustainability of the Medicaid program." Ctrs. for Medicare & Medicaid Servs., *Evaluation Design Guidance for Section 1115 Eligibility and Coverage Demonstrations*, 2, https://www.medicaid.gov/medicaid/section-1115-demo/downloads/evaluation-reports/ce-evaluation-design-guidance.pdf; *see also* Ctrs. for Medicare & Medicaid Servs., *Appendix to Evaluation Design Guidance for Section 1115 Eligibility & Coverage Demonstrations: Community Engagement*, 1, https://www.medicaid.gov/medicaid/section-1115-demo/downloads/evaluation-reports/ce-evaluation-design-guidance-appendix.pdf; Seema Verma, *Good Ideas Must Be Evaluated*, Ctrs.

for Medicare & Medicaid Servs. Blog (Mar. 14, 2019), https://www.cms.gov/blog/good-ideas-must-be-evaluated (last visited Nov. 22, 2019).

147.    On March 27, 2019, after *Stewart v. Azar*, 366 F. Supp. 3d 125 (D.D.C. 2019) and *Gresham v. Azar*, 363 F. Supp. 3d 165 (D.D.C. 2019) vacated and remanded HHS's approval of work requirements and other restrictions in Kentucky and Arkansas, Defendant Verma said: "We will continue to defend our efforts to give states greater flexibility to help low income Americans rise out of poverty." Abigail Abrams, *Medicaid Work Requirements Stall in Several States*, Time, March 28, 2019, https://time.com/5560629/medicaid-work-requirements-arkansas-kentucky/.

148.    A CMS spokesperson issued an identical statement on July 29, 2019 in response to *Philbrick v. Azar*, 2019 WL 3414376 (D.D.C. 2019), which vacated and remanded HHS's approval of New Hampshire's Section 1115 project containing work requirements. Amy Goldstein, *Federal judge strikes down New Hampshire's Medicaid work requirements*, Wash. Post, July 29, 2019, https://wapo.st/2YyegXf.

149.    On November 12, 2019, Defendant Verma again reiterated her commitment to the work requirements policy announced in the Dear State Medicaid Director Letter. She highlighted CMS's approval of "10 community engagement programs," explaining that the goal of these programs for "abled bodied adults," is to "help them live happier and healthier lives . . .  infused with meaning and purpose . . . that knows the dignity of a job." CMS Administrator Seema Verma's Speech to the National Association of Medicaid Directors in Washington, D.C, CMS.gov (Nov. 12, 2019), https://www.cms.gov/newsroom/press-releases/cms-administrator-seema-vermas-speech-national-association-medicaid-directors-washington-dc.

### G.   Effects of the HMP Amended Extension Approval on the Plaintiffs

150.    **Plaintiff Andrea Young** is 54 years old and lives alone in an apartment that she rents in Ann Arbor Michigan.

151.    Ms. Young is currently working two part-time jobs and attending Washtenaw Community College part-time, where she is working towards a bachelor's degree in sociology. She is currently taking two classes and hopes to graduate next year after completing an algebra course.

152.    Ms. Young relies on the bus to get to work and to school because she does not have a car. Depending on where she is going, travel can take between 45 minutes and two hours. She often needs to take more than one bus and the routes do not always connect.

153.    Ms. Young is currently employed as a contingent residential support worker at Avalon Housing, a residential care facility for the elderly and disabled, where she assists with client care and paperwork. As a contingent employee, she is not on the regular schedule. Instead, she is on call if the facility needs extra help or if someone needs a shift covered. She makes $14.02 per hour.

154.    Her hours vary week to week depending on Avalon's staffing needs. The shifts are eight hours, and she typically works two shifts. Some weeks, she only gets one shift. She has rarely worked three shifts in a week. Ms. Young's schedule is not within her control. Sometimes shifts are taken away and assigned to another contingent worker. Other times, she is not able to take on a last minute or midnight shift, because public transportation would take too long or is unavailable. The buses in her area do not run after 11 pm.

155.    Ms. Young also works occasionally as a library assistant at Washtenaw Community College as part of a work-study program. She makes $11.22 per hour. She is not on the regular

schedule but covers shifts for other workers when needed. She has to turn down shifts that conflict with her classes. Moreover, when the school is closed for breaks or holidays, work-study is not available. In the last month, she has not had any shifts.

156.    Ms. Young used to work at a Chrysler plant as a packer in the parts division. Her left arm was severely injured when she was hit by a hub. The accident required her to have surgery and wear a cast. While she was in the cast, Chrysler assigned her to a "one-arm" job. That increased the stress on her right arm and led to adhesive capsulitis, or "frozen shoulder." Now, Ms. Young needs to have surgery on her right arm to treat this condition. She also experiences lateral epicondylitis (tennis elbow) and osteophytes (bone spurs).

157.    Her arm and shoulder conditions cause severe pain and limit Ms. Young's ability to perform certain tasks. For instance, she cannot lift objects more than ten pounds, do repetitive activities, or drive a car because it is too painful to hold the steering wheel. Her doctors have told her that her conditions will continue to worsen over time.

158.    Ms. Young has been enrolled in the Healthy Michigan Plan since winter of 2017. She relies on Medicaid to cover weekly physical therapy and medications to help with pain and inflammation. She is also planning to start occupational therapy for her arms soon. These treatments lessen her pain so that she is able to go to work and attend school.

159.    Ms. Young also suffers from asthma. Medicaid covers her albuterol to manage her symptoms.

160.    Ms. Young will be required to complete 80 hours of work or other activities each month. She received a letter from DHHS stating that she must comply with the work requirements starting January 1, 2020. She is worried she will not be able to comply because she will not be able to complete the required activities consistently.

161.    Ms. Young is also concerned about reporting her work hours. On two occasions in the past, her Medicaid coverage was terminated and she had to go to the health department in Wayne County to get it reinstated. Both times, she discovered that DHHS had sent her notices requesting additional information but she did not receive them because the notices did not include her apartment number on the address.

162.    Without Medicaid coverage, Ms. Young would not be able to pay for her health care, including physical therapy and medications. She is worried that if she loses Medicaid her health will deteriorate and she would not be well enough to go to work or finish school.

163.    If Ms. Young had known about the Dear State Medicaid Director letter, she would have wanted to submit a comment to explain that she needs Medicaid to be able to take care of her health, and without medical treatment, her old injuries would prevent her from earning an income.

164.    **Plaintiff Maria Yakovchik** is 53 years old and lives alone in Norway, Michigan, a small town in the Upper Peninsula close to the Michigan-Wisconsin border.

165.    Ms. Yakovchik has a teaching degree from the University of Wisconsin-Green Bay and has been teaching for over 20 years. She loves working with children and seeing them learn and grow. She taught kindergarten full time until 2008, when her health problems made it difficult for her to work a full day. Since then, she has been substitute teaching.

166.    Ms. Yakovchik primarily works at three schools in her area. One is a short drive from her house, another is approximately a 30-minute drive away, and the third is across the border in Wisconsin. The teachers at these schools know Ms. Yakovchik and value her contributions in their classrooms. Teachers often request her specifically when they need to take time off.

167.    As a substitute teacher, Ms. Yakovchik's schedule varies widely and depends on how many shifts are available. A shift may be a full day or only a half-day. Some weeks, she may

work three shifts a week, but during other weeks, only one shift. In September 2019, she worked only four days because there are not many shifts available at the beginning of the school year. The weather can also dramatically change her schedule. For instance, in February 2019, the local schools closed for five days due to inclement weather.

168.    Ms. Yakovchik also has several health conditions that can interfere with her ability to work. She suffers from a Coronary Artery Vasospasm, Gastroesophageal Reflux Disease (GERD), post-concussion syndrome, sleep apnea, insomnia, chronic sinusitis, and high blood pressure. Additionally, she struggles with anxiety and depression.

169.    Coronary Artery Vasospasm causes the arteries to spasm. It can feel like a heart attack. The condition regularly causes tightness in her chest, chest pain, and shortness of breath. During particularly bad episodes, it can feel like she is dying. Stress and anxiety make these symptoms worse. She is currently treating with a cardiologist for this condition.

170.    Ms. Yakovchik's post-concussion syndrome has led to problems with her short-term memory, and she has been experiencing headaches.

171.    As a result of these health conditions, Ms. Yakovchik cannot work full time. If she works two days in a row, she needs the third day off to recuperate. She enjoys substitute teaching because she can continue to work with children and has flexibility to accept shifts only when she is well enough to work.

172.    Ms. Yakovchik has been enrolled in Michigan's Medicaid program since 2014. She relies on Medicaid coverage to see her cardiologist and a sleep doctor. Medicaid also covers medications for her heart condition and GERD, as well as a continuous positive airway pressure (CPAP) machine to treat her sleep apnea.

173.    She is planning to see a neurologist for an initial visit to treat her post-concussion syndrome, but the closest one is in Green Bay, Wisconsin, which is nearly a two-hour drive from her home. She is having difficulty affording the gas for a four-hour round trip.

174.    Ms. Yakovchik pays average copayments to her MI Health Account every quarter. The amounts vary depending on what medical services she received, but are typically around $20.

175.    Ms. Yakovchik does her best to keep her expenses low. She typically spends around $150 per month in utilities, though heat in the winter can add another $80 per month. She pays $93 per month for car insurance. She also spends approximately $100 on food each month, and regularly attends a church where they provide free meals, because she cannot afford to spend more money on food.

176.    In October 2019, Ms. Yakovchik received a letter from the State informing her that she would have to comply with the work requirements.

177.    It would be challenging for Ms. Yakovchik to comply with the work requirements because she does not regularly work 80 hours each month as a substitute teacher. She is afraid that she will have to give up being a substitute teacher and try to find a different job if she has to comply with the work requirements. There are not many jobs or volunteer opportunities close to her house, and she is concerned about her ability to drive long distances.

178.    Shortly after she received the letter, she called the Michigan Department of Health and Human Services and requested an exemption based on her medical conditions. She was told that she will not know whether she is exempt until sometime in December, right before the requirements go into effect January 1, 2020. She does not expect she will have enough time to make other arrangements if her exemption request is denied.

179.    The uncertainty about whether she will have Medicaid coverage in the future is causing Ms. Yakovchik severe stress and anxiety, which is exacerbating her health conditions and is currently making it harder for her to work more shifts.

180.    If she loses Medicaid coverage, Ms. Yakovchik's health will deteriorate and she will be unable to pay for the treatment she needs. She believes that without her Medicaid coverage she might as well make her final arrangements.

181.    If Ms. Yakovchik had known about the Dear State Medicaid Director letter, she would have wanted to submit a comment to explain that she does not think it is right that she is at risk of losing health coverage because she has health conditions that make it hard for her to work. She also would have explained that the work requirements are especially hard for people like her who rely on part-time work to survive and that access to health care is incredibly important to her because it allows her to be healthy enough to work, contribute to society, and live her life.

182.    **Plaintiff Jamie Arden** is 42 years old. She lived in Flushing, Michigan until recently when she had to flee her boyfriend's house due to domestic violence. She is currently homeless.

183.    Ms. Arden has two children, ages 10 and 18. They are living temporarily with their father until Ms. Arden finds stable housing.

184.    Ms. Arden has a master's degree in social work and is a licensed social worker. She recently started a new job as a social worker on an independent contractor basis. She is providing outpatient therapy to patients suffering from bipolar disorder, schizophrenia, depression, and other mental health conditions. She makes $35 per hour. Although she is contracted to work 40 hours per week, she only works and is paid when she has appointments scheduled and her clients show up for their appointments. For instance, one week in November 2019, she had one day with no

scheduled appointments and another day where patients only completed four out of seven scheduled appointments.

185.    She was hoping to earn between $2,000 and $3,000 per month, but given the variability in her schedule, it is unlikely this will happen.

186.    Her new job does not provide health insurance.

187.    She has been enrolled in the Healthy Michigan Plan since 2016. She has been enrolled continuously, except for one time, in 2017, when she did not receive the redetermination paperwork in the mail and was dis-enrolled. At that time, she was recovering from thyroid surgery and was unable to obtain her medications for her thyroid or her anxiety for four days. She was ultimately able to reinstate her coverage by filling out a paper application.

188.    Ms. Arden has had a hard time communicating with DHHS in the past. It has sometimes taken her over an hour to reach a caseworker by phone.

189.    Ms. Arden has several ongoing health conditions, including skin cancer, thyroid cancer, hyperglycemia, attention deficit hyperactivity disorder, anxiety, severe fatigue, vitamin deficiencies, high calcium levels, fibromyalgia, arthritis, neuropathy, muscle weakness in hands and legs, migraines, and allergies. She treats her conditions with an appropriate diet and medications including Levothyraxine, Duloxetine, Concerta, and allergy medications which are covered by Medicaid.

190.    Medicaid also covers her appointments with health care specialists, including an endocrinologist, urologist, psychiatrist, dermatologist, neurologist, optometrist, and an ear, nose, and throat specialist. She also had an outpatient surgery for urology issues earlier in 2019.

191.    Ms. Arden received a letter from DHHS indicating that she will be subject to the work requirements beginning January 1, 2020. She believes she should be exempt due to her health

conditions, and because she is currently homeless and has experienced domestic violence. She applied for an exemption with DHHS but was told that she would not know if the request was approved until sometime in December.

192.     The uncertainty about whether she will have to comply with the work requirements is causing her anxiety. She is concerned that she will not always be able to complete 20 hours per week, depending on her caseload at work. She is also concerned that she will have difficulty reporting her hours because she has had trouble communicating with DHHS in the past.

193.     Ms. Arden is also worried about having to pay premiums if she is able to increase her caseload at work. She understands that the premiums could be up to 5% of her income by October 2020 because she will have been enrolled in HMP for at least 48 months by then.

194.     Without Medicaid coverage, Ms. Arden would not be able to afford her medications or appointments with her specialists.

195.     If Ms. Arden had known about the Dear State Medicaid Director Letter she would have wanted to submit comments to explain that people need to first be healthy in order to work to be able to meet their basic necessities of food, water and shelter.

196.     **Plaintiff Katina Petropoulos** is 39 years old and lives with her aunt in Ann Arbor, Michigan.

197.     Ms. Petropoulos grew up in Florida and was placed in foster care at age 14. She was diagnosed with schizophrenia around that time and, over the course of several weeks, was institutionalized in a mental health facility, a specialized foster care home, and another residential facility. She was ultimately placed with her aunt in Michigan when she was 15. She has lived with her aunt ever since.

198.    Ms. Petropoulos is not currently working. Her mental illness makes it difficult for her to work. In the past, she has had a few steady jobs that did not last. She worked during the elections in the local polling places, as a home health aide, the head cleaner in a mall, and as an office cleaner. Her most recent job was cleaning offices for ACP Facility Services. She has applied for multiple jobs but has not found a position. She finds the process very difficult.

199.    She has no income. Her mother sends money to her aunt to cover rent and her boyfriend will sometimes help her pay for things, like gas for her car. Every month it is a struggle to make ends meet.

200.    She applied for Social Security Disability Insurance in 2017 and was denied. She requested a hearing, which was scheduled for the summer of 2019. She was unable to find an attorney, however, and ultimately withdrew her appeal.

201.    She relies on Medicaid to cover annual physical exams, blood work, mental health treatment, and treatment as needed when she gets sick. It also covers her prescriptions and appointments with a therapist twice a month.

202.    Sometime in the fall, Ms. Petropoulos received a letter from DHHS stating that she would have to comply with the work requirements beginning January 1, 2020. She did not understand the letter, so she went to her local DHHS office to find out more about it.

203.    Ms. Petropoulos knows that she will not be able to meet the work requirements. She has applied for many jobs and gone on interviews but has not been offered a job. Volunteering is difficult for the same reasons that keeping a job is a struggle; she has a hard time keeping a schedule and doing what is asked of her.

204.    She thinks she applied for an exemption when she went to DHHS after receiving the letter, but is not sure. She has not heard anything back from DHHS about the exemption and she is worried she might not qualify because she is not getting Social Security disability benefits.

205.    The uncertainty about her Medicaid coverage is causing stress and anxiety. She is worried that she will lose her Medicaid coverage. Without coverage she will not be able to get medical care or her prescriptions and is anxious about what would happen if she gets sick.

206.    She also would not be able to afford to see her therapist. Although she has not been institutionalized since she was a teenager, she is worried that without being able to see her therapist, her mental health could deteriorate and she could need institutionalization again.

207.    Had Ms. Petropoulos known about the Dear State Medicaid Director Letter, she would have wanted to submit comments to explain that she wants to work and has worked in the past, but had a very hard time keeping a job because her mental health interferes. She would have wanted to say that she is doing her best and it is not fair to take away her health coverage.

**CLAIMS FOR RELIEF**

**COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(DEAR STATE MEDICAID DIRECTOR LETTER)**

208.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

209.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

210.    The HMP Amended Extension Application Approval was based in substantial part on the policy announced in the January 11, 2018 Dear State Medicaid Director Letter. 2018 Approval Letter at 2, 4.

211.    The Dear State Medicaid Director Letter was required to be, but was not, issued through notice and comment rulemaking. *See* 5 U.S.C. § 553.

212.    In issuing the Dear State Medicaid Director Letter, the Defendants purported to act pursuant to Section 1115 of the Medicaid Act.

213.    Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

214.    In the Dear State Medicaid Director Letter, the Defendants relied on factors that Congress has not intended them to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for their decision that runs counter to the evidence.

215.    The Defendants' issuance of the Dear State Medicaid Director Letter exceeded the Secretary's Section 1115 waiver authority, otherwise violated the Medicaid Act, and was arbitrary and capricious and an abuse of discretion.

## COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (PROJECT AS A WHOLE)

216.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

217.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

218.     In approving the HMP Amended Extension Application, the Secretary purported to waive various requirements of the Medicaid Act pursuant to Section 1115.

219.     The approved project is not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

220.     In approving the project, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

221.     The Secretary's approval of the HMP Amended Extension Application exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

### COUNT THREE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (WORK AND COMMUNITY ENGAGEMENT REQUIREMENTS)

222.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

223.     The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

224.     In approving the work requirements of the HMP Amended Extension Application, the Secretary purported to waive 42 U.S.C. § 1396a(a)(8) and (a)(10) pursuant to Section 1115.

225.     Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

45

226.     In addition, the work requirements in the HMP project are not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

227.     In approving the work requirements in the HMP project, the Secretary relied on factors which Congress has not intended it to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for its decision that runs counter to the evidence.

228.     The Secretary's approval of the HMP project's work requirements exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

**COUNT FOUR: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(PREMIUM, COST SHARING, AND SIMILAR CHARGE REQUIREMENTS)**

229.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

230.     The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

231.     In approving the HMP project's average copayments, "monthly contributions," premiums, and associated penalties for failure to pay, the Secretary purported to waive 42 U.S.C. §§ 1396a(a)(10)(B), (a)(17), and (a)(14) pursuant to Section 1115.

232.     The Secretary's approval of these components is not authorized by the Medicaid Act. 42 U.S.C. §§ 1396o, 1396o-1.

233.     The Secretary's approval of these components is categorically outside the scope of the Secretary's Section 1115 waiver authority.

234.    In addition, the Secretary's approval of these components is not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

235.    In approving the average copayments, "monthly contributions," premiums, and associated penalties for failure to pay in the HMP project, the Secretary relied on factors which Congress has not intended it to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for its decision that runs counter to the evidence.

236.    The Secretary's approval of these components exceeded his Section 1115 waiver authority, otherwise violated the Medicaid Act, and was arbitrary and capricious and an abuse of discretion.

## COUNT FIVE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (HEALTHY BEHAVIOR REQUIREMENTS)

237.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

238.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

239.    In approving the healthy behavior requirements as a condition of eligibility for the HMP project, the Secretary purported to waive 42 U.S.C. § 1396a(a)(8) and (a)(10) pursuant to Section 1115.

240.    Termination of Medicaid coverage for failing to successfully complete healthy behavior requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

241.     In addition, the healthy behavior requirements in the HMP project are not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

242.     In authorizing Michigan to terminate coverage for individuals failing to complete healthy behaviors as set forth in the HMP project, the Secretary relied on factors Congress has not intended it to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for its decision that runs counter to the evidence.

243.     The Secretary's approval of the project's termination of Medicaid coverage for failing to complete healthy behavior requirements exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

## COUNT SIX: VIOLATION OF THE TAKE CARE CLAUSE, ARTICLE II, SECTION 3, CLAUSE 5

244.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

245.     Plaintiffs have a non-statutory right of action to have enjoined and declared unlawful official action that is ultra vires.

246.     The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id*. §§ 1, 8.

247.     The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

248.     After a federal law is duly enacted, the President has a constitutional duty to "take Care that the Laws be faithfully executed." *Id*. art. II, § 3.

249.     The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See, e.g.*, *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

250.     The Take Care Clause limits the power of the President and the officers he personally appoints, including Defendant Azar, and ensures that the President and his officers will faithfully execute the laws that Congress has passed.

251.     Under the Constitution, the President and his officers lack the authority to rewrite congressional statutes or to direct federal officers or agencies to effectively amend the statutes he is constitutionally required to execute.

252.     The Secretary has expressed his intention to "oversee the next great generation of transformation in Medicaid."

253.     The power to "transform" a congressional program is a legislative power vested in Congress. An effort to "transform" a statute outside that legislative process is at odds with the President's constitutional duty to take care that the laws be faithfully executed.

254.     The Medicaid population targeted by the HMP project is the expansion population, which Congress added to Medicaid by passing the Affordable Care Act. The Executive Branch has repeatedly expressed its hostility to the Affordable Care Act and its desire to undermine its operation. An effort to undermine the Affordable Care Act by undoing the extension of Medicaid to the expansion population is at odds with the President's duty to take care that the laws be faithfully executed.

255.    The President's Executive Order set out herein directs agencies to take action contrary to the ACA, Medicaid, and other laws passed by Congress.

256.    The Defendants' actions, as described herein, followed that Executive Order.

257.    The Defendants' actions, as described herein, seek to redefine the purposes and objectives of the Medicaid Act, including through the approval of the HMP Amended Extension Application represent a fundamental alteration of Medicaid.

258.    The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

259.    The Defendants' actions are in violation of the Take Care Clause and are ultra vires.

260.    Plaintiffs will suffer irreparable injury if the Secretary's actions following the President's Executive Order are not declared unlawful and unconstitutional because those actions have injured or will continue to harm Plaintiffs.

261.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.    Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2);

2.    Declare that Defendants' issuance of the Dear State Medicaid Director Letter violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

3.      Declare that Defendants' approval of the Michigan HMP Amended Extension

Application violates the Administrative Procedure Act, the Social Security Act, and

the United States Constitution in the respects set forth above;

4.      Preliminarily and permanently enjoin Defendants from implementing the practices

purportedly authorized by Dear State Medicaid Director Letter and the approval of

the Michigan HMP Amended Extension Application;

5.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C.

§ 2412; and

6.      Grant such other and further relief as may be just and proper.

November 22, 2019                                Respectfully submitted,

By: /s/ Jane Perkins
Jane Perkins                                    Kelly L. Bidelman
Sarah Somers                                    Linda A. Jordan
Sarah Grusin                                    Center for Civil Justice
National Health Law Program                     436 S. Saginaw Street, Suite 400
200 N. Greensboro Street, Suite D-13            Flint, MI 48502
Carrboro, NC 27510                              Phone: 810-244-8044
Phone: 919-968-6308 (x101)                      kbidelman@ccj-mi.org
perkins@healthlaw.org                           ljordan@ccj-mi.org
somers@healthlaw.org
grusin@healthlaw.org                            Lisa Ruby
                                                Michigan Poverty Law Program
                                                15 S. Washington
                                                Ypsilanti, MI  48197
                                                Phone: 734-998-6100 ext.617
                                                lruby@mplp.org